# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**DONALD A. SMITH,**

         **Plaintiff,**

**v.**
         **Civil Action No. 2:04CV54**
         **(The Honorable Robert E. Maxwell)**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

         **Defendant.**

## AMENDED REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying his claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Standing Order No.6.

### I. Procedural History

Donald A. Smith ("Plaintiff") filed an application for SSI and DIB on October 30, 2000. Plaintiff alleged disability since September 26, 1997, due to broken/shattered tibia and fibula fracture, elbow injury, and back separations (R. 70-72, 95, 296-97). Plaintiff's applications were denied at the initial and reconsideration levels (R. 41, 299) Plaintiff requested a hearing, which Administrative Law Judge Steven D. Slahta ("ALJ") held on March 19, 2002, and at which Plaintiff, represented by Travis Miller, Esquire, and Dr. Larry Ostrowski, Vocational Expert ("VE")

testified (R. 319-46). On May 2, 2002, the ALJ entered a decision, and, in that decision, the ALJ noted that Plaintiff had previously filed SSI and DIB applications on March 8, 2000. He found that, because Plaintiff had filed the October, 30, 2000, within one (1) year of the earlier filing date, the March 8, 2000, applications would be reopened and revised (R. 22-23, 67-69, 287-89). The ALJ found Plaintiff was disabled during the period between September 27, 1997, and April 19, 2000, but Plaintiff was not disabled after April 19, 2000, because he could perform specific sedentary jobs identified by a vocational expert (R. 22-34 ). On July 23, 2004, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6-9).

## II. Statement of Facts

Plaintiff was born on March 26, 1969, and was forty-two (42) years old at the time of the administrative hearing (R. 67, 319). Plaintiff completed eleven and one-half (11½) years of high school (R. 322). During the period prior to the onset of Plaintiff's alleged disability, he worked on oil drilling rigs and as a heavy equipment operator, occupations which the vocational expert characterized as semi-skilled and unskilled work, with heavy to very heavy exertional demands (R. 86, 344).

On September 26, 1997, Plaintiff sustained an open fracture of the tibia bone in his left leg while working at his drilling job (R. 250). On September 27, 1997, William G. Sale, M.D., of Bone and Joint Surgeons, Inc., performed debridement and fixation of Mr. Smith's left leg fracture (R. 190). Dr. Sale examined and treated Plaintiff for his post surgery condition on October 7, 1997; October 9, 1997; October 21, 1997; October 23, 1997; October 31, 1997; December 12, 1997; February 17, 1998; February 17, 1998; April 17, 1998, June 2, 1998; and June 16, 1998 (R. 184-90).

2

A June 16, 1998, x-ray revealed Plaintiff's fibula had healed completely but that "generalized consolidation of the radiolucent fracture lines" had occurred with the proximal tibia (R. 185). On July 20, 1998, Dr. Sale performed surgery to "make sure there [was] not a delayed union." Dr. Sale removed side plate screws and cerclage wire in Plaintiff's leg, "followed by debridement for fracture nonunion osteotomy of fibula" and an intramedullary rodding and bone grafting (R. 184). A July 31, 1998, x-ray showed "good position of the fracture" (R. 183).

Dr. Sale treated Plaintiff for his July 20, 1998, post-surgery condition on July 31, 1998; August 4, 1998; August 11, 1998; August 18, 1998; September 8, 1998; September 29, 1998; October 13, 1998; October 27, 1998; January 5, 1999; February 23, 1999; and March 12, 1999 (R. 178-83). On May 12, 1999, Plaintiff underwent surgery, at which time Dr. Sale removed three "transverse locking screws from [the] left proximal tibia" (R. 178). After reviewing the May 25, 1999, x-ray, Dr. Sale opined that Plaintiff's fracture appeared to have healed "on all views." He noted "bridging callous posteriorly" and that the "proximal nail [was] a little prominent underneath the tibial tubercle proximally" (R. 178).

On August 9, 1999, Plaintiff underwent surgery for the removal of intramedullary rod of the left tibia (R. 177). Dr. Sale treated Plaintiff on August 13, 1999; September 10, 1999; September 28, 1999; and November 12, 1999 (R. 175-77).

On October 21, 1999, Philip R. VanPelt, M.D., an orthopedic surgeon, saw Plaintiff relative to his workers' compensation claim involving his left leg. He observed Plaintiff walked with a "left leg limp"; was not using a cane; and had "tenderness throughout the lower left leg." Dr. VanPelt diagnosed "[s]tatus post open fracture of the left tibia and fibula"; [s]tatus post nonunion left tibia and fibula"; and [s]tatus post surgery and instrumentation times two" (R. 168). Dr. VanPelt opined

that the atrophy experienced by Plaintiff in his left leg was "probably" a result of disuse and that he had not reached his "maximum medical improvement" (R. 169).

On February 1, 2000, Dr. Sale observed good range of motion of Plaintiff's knee and ankle and opined he had nothing "further to offer him at this point." He diagnosed "some post fracture osteopenia in his left leg, which will get better with time." He noted Plaintiff had "reached a maximum degree of improvement and should be referred out for the IME impairment evaluation" (R. 174). In a form Dr. Sale completed for the Workers' Compensation Division, he estimated Plaintiff could return to full-time work on May 1, 2000 (R. 244).

On March 23, 2000, P. Kent Thrush, M.D., of Fairmont, West Virginia, examined Plaintiff at the request of the Workers' Compensation Division. Dr. Thrush noted he had examined Plaintiff on four (4) previous occasions relative to the open fracture of the left tibia (R. 250). At the March 23, 2000, examination, Plaintiff complained of chronic aching at the left proximal tibia; stated he could walk only short distances, could not perform any work, and experienced no drainage; and asserted he was treating his pain with over-the-counter medications. Dr. Thrush diagnosed "[s]tatus post open fracture of left tibia" and opined "the fracture is healed" but that "it was normal for this type of fracture to be a bit symptomatic for a long period of time" (R. 252-53).

On April 19, 2000, an x-ray of Plaintiff's lumbar spine showed stage III spondylolisthesis[1] at L-5 on S-1 (R. 200).

On April 20, 2000, Rodolfo Gobunsuy, M.D., conducted a consultative evaluation of Plaintiff for the West Virginia Disability Determination Service. Plaintiff's chief complaints were shortness

---

[1]Spondylolisthesis: forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the part interarticularis. *Dorland's Illustrated Medical Dictionary* 1684 (29th Ed. 2000).

of breath and pain in his lower back and left leg (R. 191). Dr. Gobunsuy noted Plaintiff was not taking any medications for his conditions. He observed Plaintiff was a smoker "with a history of coughing and shortness of breath." Dr. Gobunsuy also noted Plaintiff was "comfortable in a supine and sitting position"; his "intellectual functioning and mental status" were normal; Plaintiff's gait was "not lurching, unsteady or unpredictable"; and Plaintiff was "stable at station" and did not require any "ambulatory aid" (R. 192). Plaintiff was "able to walk on heels, toes, and do heel-to-toe tandem," able to stand on one (1) leg at a time, and "able to write, button and pick up coins with either hand without difficulty" (R. 193-94). Dr. Gobunsuy opined that Plaintiff's spine curvature was normal and without spasms, and his shoulders, elbows, wrists, and hips were not tender. Plaintiff's knee joint was "tender medially, laterally, and anteriorly" to the proximal tibia, but without crepitations and effusions. His ankles and feet were normal (R. 194). Dr. Gobunsuy's impression was for possible posttraumatic arthritis of the left knee and bony deformity. He opined there was "no indication of active inflammatory processes," but there was evidence of "favoring," which, according to Dr. Gobunsuy, was expected. Additionally, Dr. Gobunsuy noted Plaintiff could not squat "due to his knee and leg"; had "no radicular symptom or numbness" in his legs; demonstrated a range of motion in his lower back that was normal; and had normal reflexes down his legs. Dr. Gobunsuy also observed Plaintiff had chronic bronchitis, as he was a "smoker," but he had clear lungs and no restriction to his air entry (R. 194-95).

On June 11, 2000, Plaintiff was treated at St. Joseph's Hospital Emergency Department. He complained of left leg and back pain, left leg swelling, and a "new injury" to his left foot (R. 203). He was diagnosed with chronic leg pain (R. 202).

On October 6, 2000, Plaintiff was evaluated by Joseph A. Snead, M.D., of the Weston

Orthopedic Clinic, located in Weston, West Virginia, for chronic low back pain. Dr. Snead found Plaintiff's left ankle and knee to have normal range of motion (R. 207). He reviewed the x-rays of Plaintiff's lumbar spine, left tibia and fibula, and left knee, which were taken that day. The x-ray of Plaintiff's lumbar spine showed grade 2 spondylolisthesis at L5-S1 and significant narrowing and sclerotic changes of the disc level. The x-ray of Plaintiff's left tibia and fibula showed deformity of the proximal tibia and fibula consistent with his 1997 fracture and radiolucencies of the bone. The x-ray of Plaintiff's left knee showed no acute abnormality (R. 208). Dr. Snead diagnosed post-traumatic pain in his left leg and "symptomatic spondylolisthesis with a grade 2 slip." He opined Plaintiff was disabled from engaging in "any kind of work that involves heavy lifting, bending over or squatting" and was limited to "sedentary type activity" (R. 207).

On December 14, 2000, a state-agency physician, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk for about six (6) hours in an eight (8) hour workday; sit for a total of about six (6) hours in an eight (8) hour workday; and push/pull unlimited (R. 211). Dr. Franyutti found Plaintiff should occasionally limit climbing, balancing, stooping, kneeling, crouching, and crawling (R. 212). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 213-14). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, but had no limitations to his exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, or hazards (R. 214). Dr. Franyutti found Plaintiff's RFC to be for light work (R. 215).

On January 1, 2001, Dr. Snead corresponded to the law firm of Wilson and Bailey concerning his December 6, 2000, evaluation of Plaintiff. He wrote that Plaintiff's "major complaint is pain in the leg between the knee and the ankle anteriorly. It is a burning type of pain with pins

6

and needles all the way down to the top of the foot. The pain is present 24 hours a day seven days a week, but if he walks any distance at all the leg swells and also the pain becomes worse. The pain is always anteriorly and also on top of the foot. The patient says he can only stand for an hour at a time" (R. 257). He wrote that his examination of Plaintiff revealed that his right ankle was unstable on the lateral side "with a good 2+ opening of the talus in the ankle mortis." Plaintiff's left knee and leg revealed full range of motion and full flexion and extension. Dr. Snead could not locate a "dorsalis pedis pulse either with a Doppler or digitally." Plaintiff's toe flexion was poor, but all other motions movements for the Plaintiff's toe and ankle were normal. The sensation at the entire perineal nerve in front of the leg and on top of the foot was diminished. Plaintiff walked with a limp and an antalgic type gait (R. 258). Dr. Snead diagnosed residuals of compound fracture left tibia; reflex sympathetic dystrophy or causalgias type leg pain; probably claudication in the left leg manifested by absent dorsalis pedis pulse; and instability of the right ankle post traumatic. He determined Plaintiff's disability was at "22% whole person impairment" (R. 259).

On August 21, 2001, Bruce Guberman, M.D., a certified independent medical examiner, conducted a consultative examination of Plaintiff relative to his breathing and chest pain conditions. Dr. Guberman referred to the 1993 x-ray of Plaintiff's lungs that showed "acute pulmonary nodules related to . . . Histoplasmosis[2]" (R. 260). Plaintiff informed Dr. Guberman that he "continued to have chest pains occurring six to eight times per day" that radiate to his back and arms, experienced shortness of breath when walking fifty (50) feet, experienced wheezing each day, and produced "green sputum without hemoptysis" when he coughed (R. 261). Dr. Guberman noted Plaintiff did not take any medication. Plaintiff stated he experienced palpitations "three or four times per week,"

---

[2]Histoplasmosis: infection resulting from inhalation, or sometimes ingestion, of spores of *Histoplasma capsulatum. Dorland's Illustrated Medical Dictionary* 826 (29th Ed. 2000).

which lasted from one-half (½) to one (1) hour and during which he experienced light headedness, "but not syncope[3]." Plaintiff's pulse was sixty (60) and regular, respiratory rate was fourteen (14) and unlabored, and blood pressure was 120/76. Dr. Guberman noted Plaintiff's gait to be mildly antalgic and limping, but stable and observed Plaintiff was "comfortable in the supine and sitting position [sic]." Plaintiff's breath sounds were mildly decreased and there was "mild prolongation of the expiratory phase of respiration." Plaintiff's "A/P diameter of the chest [was] normal" and no wheezes, rales, or rhonchi were detected. Dr. Guberman observed that Plaintiff did "not use the accessory muscles of respiration and the chest [was] clear to percussion." Additionally, Plaintiff's first and second heart sounds were normal and no murmurs, gallops, clicks, or rubs were detected (R. 262). Dr. Guberman's diagnosis was for "[p]ulmonary histoplasmosis due to his exposure to bat guano." He opined Plaintiff exhibited "evidence of obstructive lung disease" and that he had symptoms that were consistent with chronic bronchitis. Plaintiff, according to Dr. Guberman, had "not yet reached maximum medical improvement" (R. 263).

A ventilatory function test was administered to Plaintiff on August 21, 2001, which revealed that Plaintiff performed at 54% of the predicted values (R. 266).

On August 24, 2001, Katie Hoover, M.D., performed a consultative examination of Plaintiff for the West Virginia Disability Determination Services. Plaintiff's chief complaints were "problems with his legs" and "back problems." Dr. Hoover noted Plaintiff experienced chest pain, cough, occasional wheezing, and frequent dizzy spells (R. 220). Dr. Hoover observed that Plaintiff's chest was clear "to percussion and auscultation" and that Plaintiff had no wheezing, rales, or rhonchi. Dr. Hoover opined Plaintiff's heart sounds were normal and there were "no murmurs,

---

[3]Syncope: a temporary suspension of consciousness due to generalized cerebral ischemia; a faint or a swoon. *Dorland's Illustrated Medical Dictionary* 1747 (29th Ed. 2000).

gallops, clicks, or rubs" (R. 221). Dr. Hoover observed Plaintiff had "hypersensitivity and hyperesthesias[4]" of the left leg and "some numbness over his scarring." Plaintiff exhibited "no dorsalis pedis pulse in the left leg." The following range of motion ability of Plaintiff was noted: lumbar flexion was 40 degrees; lateral flexion was 5 degrees; neck rotation was neck 40 degrees; both shoulder abduction was 150 degrees; both elbows flexion was 150 degrees; and both hands flexion was 100 degrees. He could flex his right hip100 degrees and his left hip 90 degrees. He could flex his right knee 120 degrees and his left knee 100 degrees. He could dorsiflex his right ankle 20 degrees and his left ankle 10 degrees. He could plantar flex both ankles 40 degrees. Plaintiff could walk on his tiptoes, but was unable to heel walk on the left. Plaintiff could heel-toe walk and squat to 45 degrees. Dr. Hoover opined that Plaintiff appeared "to have severe injury to his lower leg, which does cause him chronic pain and swelling with any standing." Dr. Hoover determined that Plaintiff's leg injury, coupled with the spondylolisthesis, disc narrowing, and sclerotic changes, caused him to be "disabled from his previous work in the oil field" (R. 222).

On August 28, 2001, an x-ray was performed on Plaintiff's chest. The soft tissues and the rib cage were normal; the costophrenic sinuses were "well delineated"; the lung fields were clear; and the heart was normally configured (R. 267).

On September 1, 2001, Thomas Lauderman, D.O., a non-examining, state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty (20) pounds; frequently lift and/or carry ten (10) pounds; stand and/or walk about six (6) hours in an eight (8) hour workday; sit for a total of about six (6)

---

[4]Hyperesthesia: a dysesthesia consisting of increased sensitivity, particularly a painful sensation from a normally painless touch stimulus. *Dorland's Illustrated Medical Dictionary* 850 (29th Ed. 2000).

hours in an eight (8) hour workday; and push/pull unlimited (R. 226). Dr. Lauderman found Plaintiff should occasionally be limited in climbing, balancing, stooping, kneeling, crouching, and crawling (R. 227). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 228-29). Dr. Lauderman found Plaintiff should avoid concentrated exposure to extreme cold and heat, vibrations, and hazards, but had no limitations in his exposure to wetness, humidity, noise, or fumes (R. 229). Dr. Lauderman reduced Plaintiff's work to the light exertional level (R. 230).

On October 24, 2001, Prasad V. Devabhaktuni, M.D., of Pulmonary and Critical Care Medicine, located in Fairmont, West Virginia, examined Plaintiff relative to his histoplasmosis, chronic bronchitis, and bilateral nodular densities. Plaintiff stated to Dr. Devabhaktuni that he experienced dyspnea[5] "on even minimal exertion." Plaintiff informed Dr. Devabhaktuni that he could "walk a few city blocks on level ground" but that walking up grade or up steps caused him to become dyspneic. Plaintiff stated that his cough produced white sputum, and he experienced "occasional anterior chest pain," "occasional neck and arm numbness," wheezing, nightly fever and chills, and heartburn. Dr. Devabhaktuni noted Plaintiff smoked one (1) package of cigarettes per day for the past twenty-five (25) to thirty (30) years (R. 269). Upon examination, Plaintiff's blood pressure was 140/90, heart rate was "58" per minute, and respiratory rate was "20" per minute. Plaintiff's lungs were clear to auscultation and percussion, and his heart exhibited a regular rate and rhythm with no murmur or gallop (R. 269). Dr. Devabhaktuni noted Plaintiff's chest x-ray showed hyperexpanded lung fields and bilateral pulmonary nodules and the pulmonary report showed "normal FVC and FEV1" (R. 269). Dr. Devabhaktuni's recommendations to Plaintiff were as

---

[5]Dyspnea: breathlessness or shortness of breath; difficult or labored breathing. *Dorland's Illustrated Medical Dictionary* 558 (29th Ed. 2000).

follows: discontinue smoking and consider bronchodilators. He suggested a comparison of new and old x-rays to "see if he has any new nodular densities which may need further evaluation as he has significant history of smoking . . ." (R. 268).

On November 15, 2001, Larry Carson, M.D., of the West Virginia University Department of Neurosurgery, located in Morgantown, West Virginia, completed an outpatient progress form of Plaintiff at the request of Nick Zervos, M.D. (R. 283-84). Plaintiff presented "with low back and right posterior calf pain." Plaintiff informed Dr. Carson that he had fallen out of a barn at the age of fourteen (14) or fifteen (15), which caused "intermittent pain with his back" and that his broken leg in 1997 had caused pain in that leg. Plaintiff reported to Dr. Carson that he experienced "numbness and tingling of his arms and legs" as well as weakness in those extremities. Plaintiff stated moist heat made "the pain better and that activities" worsened the pain. Plaintiff informed Dr. Carson that he could "walk 10 to 50 feet before he [had] to stop and rest." Plaintiff stated he did not use a cane or crutches. Plaintiff informed Dr. Carson that his past medical history included "lung disease with fungal lung infection," fractured leg with nerve damage, and circulatory problems. Plaintiff stated his previous surgery was for rhinoseptoplasty in 1982. Plaintiff stated he was not taking any medications other than over-the-counter nonsteroidal medications, he smoked one (1) package of cigarettes per day, and he did not drink. Plaintiff informed Dr. Carson that he was blind in his right eye, that the fungal infection in his lungs caused difficulty in his breathing, that his ankles were weak, that his balance was unstable, that he was "a little dizzy," and that he had no psychological problems (R. 283). The examination of Plaintiff by Dr. Carson revealed his chest and lungs were clear to auscultation and percussion and his heart rate was regular and had no murmur. Plaintiff was able to move his extremities, and he presented with no cyanosis, clubbing,

11

or edema. His brachioradial, femoral, dorsalis pedis, and posterior tibia pulse was "2+ generally." Plaintiff was oriented as to person, place, and time. His recent memory, remote memory, and abstract thinking were judged as good. Plaintiff's "[m]otor, deltoid, biceps, triceps, reflexes, extension, and grip [were] graded 5/5 bilaterally." His "[h]ip and knee flexion extension, ankle and great toe dorsiflexion and plantar flexion [were] 5/5 bilaterally." Plaintiff's sensation was intact to pinprick and soft touch. His deep tendon reflexes were "2+ generally" with "no Babinski or Hoffmann noted." Diffuse tenderness over Plaintiff lumbosacral spine, especially at the S1 joints, was noted. Dr. Carson opined the x-ray showed Grade 1 spondylolisthesis at L5 and S1, and that was the doctor's impression (R. 284).

On December 20, 2001, Plaintiff underwent a neurologic examination, which was conducted by N. R. McFadden, PA-C, of the West Virginia University Department of Neurosurgery, located in Morgantown, West Virginia (R. 276). Physician Assistant McFadden noted Plaintiff stated he had low back pain and bilateral leg pain. Plaintiff's neurologic examination by Physician Assistant McFadden revealed his "deep tendon reflexes were +2/2 in all major groups in the lower extremities." Plaintiff's motor examination was "5/5 without any giveaway weakness bilaterally." The sensory examination "showed a patchy type of dysesthesias of both lower legs." Plaintiff had a negative straight leg raise bilaterally. Physician McFadden reviewed the November 15, 2001, MRI of Plaintiff's lumbar spine and the December 3, 2001, MRI of Plaintiff's thoracic spine before diagnosis Plaintiff (R. 276, 286, 310). Physician Assistant McFadden "felt . . . the patient had spondylolisthesis and a TLSO brace was prescribed for" Plaintiff (R. 276).

### New Evidence Submitted to the Appeals Council

After the ALJ issued his decision, Plaintiff submitted additional evidence to the Appeals Council, which was presented in exhibit form in the record of this case and which was as follows:

1) November 18, 2002, letter from James D. Weinstein, M.D., to William Sembello, M.D., wherein Dr. Weinstein informs Dr. Sembello that Plaintiff's examination was negative for lumbosacral nerve root dysfunction; that Dr. Weinstein desired to see the recent lumbar MRI which was performed on Plaintiff; and that Plaintiff's condition did not reveal "anything operative" (Plaintiff's Exhibit C).

2) December 9, 2002, letter from James D. Weinstein, M.D., to William Sembello, M.D., wherein Dr. Weinstein opined the MRI of Plaintiff's back showed "Grade II spondylolisthesis at L5/S1 with disc deformity and bilateral parts defects" which "might be affecting the nerve roots going through the 5/1 foreamen" and opined Plaintiff's thoracic MRI showed "central disc herniation at T10/11" (Plaintiff's Exhibit C).

3) May 20, 2003, psychological evaluation of Plaintiff by Brenda Hinkle (Smith), M.A., and Robert J. Klein, Ed.D., of Family & Marital Counseling Center, located in Weston, West Virginia (Plaintiff's Exhibit A). Ms. Hinkle and Mr. Klein administered the WAIS-III test and found Plaintiff's Verbal IQ was 74, Performance IQ was 75, and Full Scale IQ was 72 (Plaintiff's Exhibit A at p.1). Plaintiff was administered the WRAT-III, on which he scored the following: reading – sixth grade; spelling – fifth grade; and arithmetic – eighth grade (Plaintiff's Exhibit A at p. 2). Plaintiff stated he had difficulty concentrating, felt hopeless, felt guilty, felt worthless, was irritable and yelled, felt restless, had anhedonia[6], experienced poor sleep because of pain, experienced increased appetite, cried one (1) time each day, experienced varying degrees of energy, felt anxious, and experienced a depressed mood (Plaintiff's Exhibit A at p. 2). Ms. Hinkle and Mr. Klein opined Plaintiff's comprehension was "markedly deficient." Plaintiff's immediate and remote memories

---

[6]Anhedonia: total loss of feeling of pleasure in acts that normally give pleasure. *Dorland's Illustrated Medical Dictionary* 89 (29th Ed. 2000).

were within normal limits, but his recent memory was moderately deficient. Ms. Hinkle and Mr. Klein opined Plaintiff's concentration was normal, his pace and persistence were mildly deficient, and he demonstrated no significant psychomotor behavior (Plaintiff's Exhibit A at p. 4). Ms. Hinkle and Mr. Klein diagnosed the following: Axis I – Major Depressive Disorder, single episode, moderate; Axis II – Borderline Intellectual Functioning; and Axis III – chronic obstruction pulmonary disease, asthma, chronic bronchitis, back problems, and lung fungus by self report (Plaintiff's Exhibit A at p. 4). The examiners' impression was that the diagnosis of major depressive disorder, single episode, moderate, was given because of Plaintiff's "reporting during the mental status examination" (Plaintiff's Exhibit A at p. 5).

4) May 30, 2003, Medical Assessment of Ability to do Work-Related Activities Form completed by Ms. Hinkle and Mr. Klein, wherein they opined Plaintiff's ability to use judgment, interact with supervisors, or deal with work stresses was poor, and Plaintiff's ability to understand, remember, and carry out complex job instructions was poor (Plaintiff's Exhibit A at pp. 6, 7).

5) July 15, 2003, admission of Plaintiff to Monongalia General Hospital, located in Morgantown, West Virginia, for an acute inferolateral myocardial infarction and hyperlipidemia. An emergency percutaneous transluminal coronary angioplasty of the right and circuflex coronary arteries was performed. A Chpher stent was inserted in the right coronary artery. All arteries were "open and patent . . ." but "severely stenosed." Plaintiff's left anterior descending artery showed midlevel disease. He was discharged "on the usual beta blockade, ACE and Lipitor" and "Plavix was recommended for a minimum to 9 months" (Plaintiff's Exhibit D at p. 2).

6) September 25, 2003, coronary angiography of Plaintiff at Monongalia General Hospital, which showed multivessel coronary artery disease with high-grade "RCA lesion in the proximal third and noncritical in-stent restenosis at the ostium of the previously stented obtuse marginal."

14

An angioplasty was performed for "lifestyle change and risk factor modification." The procedure was "successful" with "stent placement x 1 to the proximal third of the right coronary artery" (Plaintiff's Exhibit D at p. 56).

7) November 6, 2003, letter of Rammy S. Gold, M.D., a neurologist, to Plaintiff's lawyer relative to Plaintiff's cervical and lumbar spine (Plaintiff's Exhibit B at p. 1). Dr. Gold relied on scans of Plaintiff's spine taken on June 11, 2003 (Plaintiff's Exhibit B at pp. 3-5). Dr. Gold opined that Plaintiff had Grade 1 spondylolisthesis, which was "related to a probable PARS defect . . . ." Dr. Gold stated this condition would make "prolonged standing or sitting highly difficult" for Plaintiff, thereby making it "impossible for him to participate in gainful employment." Dr. Gold observed "spondylosis at the C4-5" on Plaintiff's cervical MRI and recommended "surgical decompression and fusion for his lumbar spine." Dr. Gold further opined that, because of Plaintiff's recent "multiple cardiac stenting procedures," neurosurgical intervention was not an "acceptable risk" (Plaintiff's Exhibit B at p. 1). The radiological test of Plaintiff's cervical spine, dated June 11, 2003, and considered by Dr. Gold, showed mild kyphosis at C4-5; no acute fracture or prevertebral soft tissue swelling; and moderate cervical spondylosis at C6-7 with narrowing and spurring (Plaintiff's Exhibit B at p. 3). The June 11, 2003, MRI of Plaintiff's cervical spine, which was considered by Dr. Gold, showed mild kyphotic angulation at C4-5 and moderate multi-level cervical spondylosis with slight narrowing and desiccation, posterior spur disc complexes at C4-5, C5-6, and C6-7, and mild spinal stenosis, but no disc herniation (Plaintiff's Exhibit B. at pp. 4-5).

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920, ALJ Slahta made the following findings:

      1.      The claimant has not engaged in substantial gainful activity since

September 26, 1997.

2. The medical evidence establishes that the claimant has the following severe impairments: residuals, status post compound comminuted left tibia/fibula fracture, Grade I spondylolisthesis, L5-S1, pulmonary histoplasmosis, and smoker's bronchitis.

3. The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulation No. 4.

4. The claimant's assertions concerning his ability to work are credible, as they relate to the period September 26, 1997 through April 19, 2000.

5. During the period September 26, 1997 through April 19, 2000, the claimant retained the residual functional capacity to sit for four hours during the work day, stand/walk for one hour during the workday, and lift and carry five pounds on an occasional basis. He needed to lie down frequently during the workday. He could not be exposed to hazards, such as dangerous, moving machinery or at heights. He needed to work in a controlled environment, free of excessive dust, fumes and pollutants. Since April 19, 2000, as a result of improvement in his impairment involving the left leg fractures, the claimant retains the ability to perform the demands of sedentary work with certain modifications. He must be allowed to sit or stand at will during the workday. He can perform no repetitive bending. He cannot be exposed to hazards, such as dangerous, moving machinery, and cannot work at unprotected heights. He must work in a controlled environment, free of excessive dust, fumes, and pollutants.

6. The claimant is unable to perform the requirements of his past relevant work.

7. The claimant's residual functional capacity for the full range of sedentary work is reduced by additional limitations.

8. On September 26, 1997, the claimant was a younger individual age 18-44.

9. The claimant has a limited education.

10. The claimant has a semi-skilled work background. His limitations preclude the transferability of any acquired work skills.

11. Based on an exertional capacity for sedentary work, and the

16

claimant's age, education, and work experience, Grid Rule 201.25, Table No. 1, Appendix 2, Subpart P, Regulations No. 4, would direct a conclusion of not disabled.

12. Considering the claimant's additional limitations present during the period September 26, 1997 through April 19, 2000, he was unable to perform the full range of sedentary work on a regular and continuing basis, eight hours a day, for five days a week (Social Security Rulings 96-8p and 96-9p).

13. Although the claimant's additional limitations present since April 19, 2000, do not allow him to perform the full range of sedentary work, using the above-cited Grid Rules as a framework for evaluation, there are a significant number of jobs in the national and regional economies that he could perform. Examples of such jobs include hand packer, assembler, and security surveillance equipment alarm monitor.

14. The claimant was under a disability, as defined by the Social Security Act, during the period September 26, 1997 through April 19, 2000 (20 CFR 404.1520(f) and 416.920(f)) (R. 32-33)

## IV. Discussion

### A. Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the

17

Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1. The ALJ erred by failing to fully and accurately address the number and severity of Plaintiff's severe impairments despite the substantial evidence supporting those impairments.

2. The ALJ erred by failing to conduct an appropriate credibility analysis as required by SSR 96-7p.

3. The ALJ erred by relying upon VE testimony, which was not consistent with the Dictionary of Occupational Titles, without attempting to resolve the conflict, as required by SSR 00-4p.

### C. New Evidence Submitted to Appeals Council

Plaintiff argues the ALJ erred by failing to fully and accurately address the number and severity of Plaintiff's severe impairments despite the substantial evidence supporting those impairments. Specifically, Plaintiff asserts Plaintiff "numerous other physical and psychological impairments existed, including [Plaintiff's] low IQ; Major Depressive Disorder, single episode, moderate; severe coronary artery stenosis; and spinal impairments at all three levels. . . . It is this picture that the Plaintiff attempted to present to the Appeals Council with the submission of the new and material evidence. The Commissioner . . . erred by failing or refusing to make a proper consideration of this evidence, which clearly demonstrates that his injury is much more severe than the ALJ originally believed" (Plaintiff's brief at pp. 9 and 10).

In *Wilkins v. Secretary*, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit determined that the

Appeals Council *will consider* evidence submitted to it if the evidence is (a) new, (b) material, and

(c) relates to the period on or before the date of the ALJ's decision. *Wilkins* further defined the

terms "new" and "material" as follows:

> Evidence is new . . . if it is not duplicative or cumulative . . . .
> Evidence is material if there is a reasonable possibility that the new
> evidence would have changed the outcome.

*Id.* at 96.

> The Appeal Council, in the instant case, found the following:

> The Appeals Council also received the psychological evaluation dated May 30, 2003
> from Brenda Hinkle, MA, the letter dated November 6, 2003 from Rammy S. Gold,
> MD, the letters dated November 18, 2000 and December 9, 2000 from James D.
> Weinstein, MD, the records dated June 11, 2003 from Saint Joseph Hospital, and the
> records dated July 15, 2003 to July 18, 2003 from Monongalla [sic] Hospital. The
> Administrative Law Judge ruled on the issue of your disability in your case only
> through May 2, 2002, the date of the decision. The information provided by your
> representative is not material to the issue of whether you were disabled on or before
> May 2, 2002. The Appeals Council is aware that you filed a subsequent application
> for a period of disability and disability insurance benefits on May 22, 2002. We are
> forwarding this new evidence to the local hearing office, 6 Suburban Court,
> Morgantown, WV 26505 (R. 7).

The Appeals Council found the evidence was not relative to the period on or before the date of the

ALJ's decision. The undersigned agrees in that the evidence of record does not contain any

complaints by Plaintiff or diagnoses by physicians of low IQ (Ms.Hinkle's May 30, 2003

psychological assessment), major depression (Ms. Hinkle's May 30, 2003, psychological

assessment), coronary disease (July 15, 2003, to July 18, 2003, records of Monongalia General

Hospital), or cervical spine impairment (Dr. Gold's November 6, 2003, letter) on or before May 2,

2002. Additionally, none of these medical experts, whose reports and opinions were submitted to

the Appeals Council, opined that any of these conditions existed on or before the date of the ALJ's

decision. Substantial evidence, therefore, does not exist that the evidence submitted to the Appeals

Council relates to the period on or before the date of the ALJ's decision.

As to the Appeals Council not considering the opinions of Drs. Gold and Weinstein as to Plaintiff's spondylolisthesis and thoracic spine conditions because those opinions were "not material to the issue," the undersigned also agrees. On November 18, 2002, Dr. Weinstein examined Plaintiff. He opined that the examination was "negative with regard to lumbosacral nerve root dysfunction." He did not recommend operative intervention and prescribed a program of walking and exercise to alleviate Plaintiff's low back symptoms (Plaintiff's Exhibit C). On December 9, 2002, after a review of Plaintiff's MRI, Dr. Weinstein opined that Plaintiff had "Grade II spondylolisthesis at L5/S1 with disc deformity and bilateral pars defects." Dr. Weinstein opined that this "pathology might be affecting the nerve roots going through the 5/1 foramen" and that a spinal fusion may be appropriate for that condition (Plaintiff's Exhibit C). On November 6, 2003, Dr. Gold diagnosed Plaintiff with "lumbar spondylolisthesis . . . grade 1" that was "related to a probable PARS defect at that level with a resultant instability." He opined that this condition would "make prolonged standing or sitting highly difficult" for Plaintiff (Plaintiff's Exhibit B). This evidence is not new; the opinions and diagnoses of Drs. Weinstein and Gold are cumulative, at best. The evidence of record contained the following: an April 19, 2000, x-ray of Plaintiff's lumbar spine showed stage III spondylolisthesis at L-5 on S-1 (R. 200); an October 6, 2000, x-ray of Plaintiff's lumbar spine showed grade 2 spondylolisthesis at L5-S1 and significant narrowing and sclerotic changes of the disc level (R. 208); an October 6, 2000, diagnosis by Dr. Snead that Plaintiff had "symptomatic spondylolisthesis with a grade 2 slip" (R. 207); an August 24, 2001, diagnosis by Dr. Hoover that Plaintiff had spondylolisthesis, disc narrowing, and sclerotic changes (R. 222); a November 15, 2001, diagnosis by Dr. Carson that Plaintiff had Grade 1 spondylolisthesis at L5 and S1 (R. 284); and a December 20, 2001, opinion of Physician Assistant McFadden that Plaintiff had

spondylolisthesis (R. 276). The ALJ relied on the above listed information in finding that Plaintiff had the severe impairment of Grade I spondylolisthesis (R. 24). He also took into account the following opinions as to Plaintiff's limitations caused by his back condition: April 20, 2000, opinion of Dr. Gobunsuy that Plaintiff presented with "no radicular symptoms or numbness in his legs" and his "[r]ange of motion was normal and reflexes were normal (R. 29); October 6, 2000, opinion of Dr. Snead that Plaintiff could not engage in work that involved heavy lifting, bending, or squatting, but could engage in sedentary work (R. 30); and November 15, 2001, opinion of Dr. Carson that Plaintiff's sensory, motor, and reflex exams were normal (R. 29). The evidence of record contained diagnosis, results of medical tests, and opinions relative to Plaintiff's spondylolisthesis which contained the same diagnosis, results, and opinions as those contained in the letters of Drs. Weinstein and Gold.

The opinion of Dr. Weinstein that Plaintiff's nerve roots through the 5/1 foramen "might" be affected by Plaintiff's low back condition and the opinion of Dr. Gold that Plaintiff's lumbar spondylolisthesis was related to "probable" PARS defect are not conclusive. Neither Dr. Weinstein nor Dr. Gold made any definitive assessment that Plaintiff's condition had worsened to involve nerve root involvement or PARS; therefore, the undersigned finds that neither doctor offered new evidence that would alter the decision of the ALJ.

As to Dr. Weinstein's opinion relative to Plaintiff's thoracic condition, the undersigned finds it is not new evidence and that the evidence of record regarding Plaintiff's thoracic condition had been evaluated by the ALJ. On December 9, 2002, Dr. Weinstein noted that Plaintiff "also had a thoracic MRI, which I reviewed. He has a central disc herniation at T10/11, but I don't think it is significant and certainly not of a degree that demands any kind of surgical intervention (Plaintiff's Exhibit C). Physician Assistant McFadden reviewed a thoracic MRI , which was performed on

21

Plaintiff on December 3, 2001 (R. 310). Dr. Weinstein does not reveal the date of the MRI he reviewed, so the undersigned has no way of discerning if they were the same scan or different scans. The December 3, 2001, MRI reviewed by Physician Assistant McFadden revealed "[d]egenerative change with central herniation at the T10/T11 level . . ." (R. 310). This is the same impression as found by Dr. Weinstein for the MRI he reviewed. Physician Assistant McFadden opined that, after consideration of this MRI and the November 15, 2001, opinion offered by Dr. Carson, Plaintiff had spondylolisthesis. Plaintiff, as a treatment for his back condition, was prescribed a TLSO brace (R. 276). Physician Assistant McFadden's opinion was considered by the ALJ (R. 29). The undersigned, therefore, finds that the evidence concerning Plaintiff's thoracic condition is not new and the evidence submitted by Dr. Weinstein to the Appeals Council would not change the opinion of the ALJ.

The undersigned concludes that substantial evidence exists to support the Appeals Council's rejection of evidence concerning Plaintiff's low IQ; Major Depressive Disorder, single episode, moderate; severe coronary artery stenosis; and cervical impairments; and the undersigned finds the Appeals Council decision relative to evidence about Plaintiff's spondylolisthesis and thoracic condition is supported by substantial evidence.

### D. Credibility

The Plaintiff contends the ALJ erred by failing to conduct an appropriate credibility analysis as required by SSR 96-7p. He asserts the ALJ did not conduct "the two-part analysis required by SSR 96-7p" (Plaintiff's brief at p. 16).

SSR 96-7p provides, in part, as follows:

The regulations describe a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness:

22

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. The finding that an individual's impairment(s) could reasonably be expected to produce the individual's pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of the individual's symptoms. If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. This requirement for a finding on the credibility of the individual's statements about symptoms and their effects is reflected in 20 CFR 404.1529(c)(4) and 416.929(c)(4). These provisions of the regulations provide that an individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.

The ALJ found the following as to Plaintiff's credibility: "Since April 19, 2000, the record establishes a basis for a degree of pain and functional limitations associated with claimant's impairments, but fails to support the disabling degree alleged by the claimant" (R. 25). This finding satisfied the requirement of step-one of SSR 96-7p.

23

The ALJ then applied the mandates of step-two of SSR 96-7p and found the following: "The claimant's testimony was not fully credible. He has reported inconsistent statements regarding the nature and severity of his impairments. His reported activities are inconsistent with the degree of pain and functional limitations alleged" (R. 25). The ALJ considered the evidence of record in formulating this decision, which included the objective medical evidence, statements from treating, examining, and/or consultative physicians, and Plaintiff's own statements about his symptoms.

The ALJ considered the following objective medical evidence: 1) October 6, 2000, x-rays of Plaintiff's left tibia, fibula and knee, which "showed a healed tibia fracture with some deformity, but the alignment was good" and showed Grade 2 spondylolisthesis, L5-S1 (R. 27, 29); 2) the August 21, 2001, x-ray of Plaintiff's chest, which was read as "normal" by Dr. Guberman and as showing "hyperexpanded lung fields and bilateral pulmonary nodules" by Dr. Devabhaktuni (R. 28, 29); and 3) the August 28, 2001, pulmonary function studies, which, according to Dr. Guberman, revealed severe chronic obstructive pulmonary disease and, according to Dr. Devabhaktuni, were normal (R. 28, 29).

The ALJ then considered and discussed the findings of the treating, examining, and/or consultative physicians as to Plaintiff's impairments. The ALJ evaluated the opinions, observations, and diagnoses of those doctors who evaluated and/or treated Plaintiff for a pulmonary condition. He considered Dr. Gobunsuy's April 20, 2000, diagnosis that Plaintiff had chronic bronchitis after an examination that revealed Plaintiff's "lungs were clear, there was no wheezing, and no restriction in air entry" (R. 28). The ALJ evaluated the August 21, 2001, observation of Dr. Guberman that Plaintiff had "mild decrease in breath sounds with a mild prolongation of the expiratory phase of respiration," had "no wheezes, rales or rhonchi," did not "use the accessory muscles of respiration," and his "chest was clear to percussion" (R. 28). The ALJ also considered Dr. Hoover's

observations that Plaintiff's "chest was clear to percussion and auscultation," that he presented with "no wheezes, rales or rhonchi," and that his "anterior/posterior diameter of the chest was normal." Dr. Hoover's opinion that Plaintiff "did not use the accessory muscles of respiration" was also considered by the ALJ (R. 28). Dr. Devabhaktuni's October 24, 2001, opinions and diagnosis that Plaintiff's lungs were clear and that Plaintiff had chronic bronchitis secondary to severe smoking were also evaluated by the ALJ (R. 29).

The ALJ also considered and evaluated opinions, observations, and diagnoses of those doctors who treated or evaluated Plaintiff as to his back and leg conditions. He reviewed and assessed the April 19, 2000, 1) diagnosis of Dr. Gobunsuy that Plaintiff "might have posttraumatic arthritis of the left knee, with his pain secondary to posttraumatic pain syndrome" and that Plaintiff's leg did have a bony deformity, but was not actively inflamed and 2) observation of Dr. Gobunsuy that Plaintiff could walk on his heels and toes and had no antalgia (R. 27). As to Dr. Gobunsuy's opinion and diagnosis relative to Plaintiff's back condition, the ALJ recognized his observation that Plaintiff's back was tender, but he did not have any radicular symptoms or numbness to his legs, and that his range of motion and reflexes were normal (R. 29). The ALJ also reviewed and evaluated Dr. Snead's October 6, 2000, opinions that the range of motion of Plaintiff's left ankle and knee was normal, and he considered his diagnosis of posttraumatic pain in his left leg secondary to the soft tissue injury" and "chronic pain situation," which was "made worse by 'heavy' activity" (R. 27). The ALJ considered the December 6, 2000, observations of Dr. Snead that Plaintiff "demonstrated diminished sensation in the entire perineal nerve distribution on the front of the leg and on top of the foot"; walked with a limp; and had a "rather antalgic-type gait"; . . . had atrophy of the left thigh and calf; had a slight extension contracture of the left big toe; had poor big toe flexion; and had no dorsalis pedis pulse, but did demonstrate a full range of motion of the left knee,

25

with full flexion and extension, and normal ankle and toe motion movements. The ALJ discussed

Dr. Snead's opinion that Plaintiff's pain increased with "'heavy'" activity or walking (R. 28). The

ALJ then considered the August 24, 2001, observations of Dr. Hoover that Plaintiff walked with

a limp, had hypersensitivity and hyperesthesias to his leg, no dorsalis pedis pulse on the left, could

walk on his tiptoes, could heel-toe walk, could not heel walk on the left (R. 27). Finally, the ALJ

considered and evaluated the findings of Dr. Carson that Plaintiff's neurological evaluation,

including sensory, motor, and reflex exams, was normal and that Plaintiff presented with tenderness

over his lumbosacral spine. The ALJ also considered P.A. McFadden's concurrence with Dr.

Carson's findings and observation that Plaintiff "had a patch type of dysesthesias of both lower

extremities" (R. 29).

After the above considerations and evaluations were made by the ALJ in his decision as to

the objective medical evidence and the statements from treating, examining, and/or consultative

physicians, he found the following:

> The above-summarized clinical findings and opinions fail to support the claimant's
> complaints of disabling pain and functional limitations since April 19, 2000. . . . As
> of that date, the x-rays showed that the fracture was healed and the claimant had
> good range of motion of the knee and ankle. He was able to walk on his heels and
> toes. The claimant also had the history of histoplasmosis prior to April 19, 2000, but
> had received no follow up treatment for this problem. His primary pulmonary
> problems at the time were related to his smoker's bronchitis. However, the
> consultative examination on April 19, 2000, revealed that his lungs were clear. He
> also reported the childhood injury to his back when examined on April 19, 2000, and
> had some tenderness on examination. He had no radicular symptoms and normal
> range of motion and reflexes (R. 30). . . .

> The findings of Dr. Guberman and Dr. Devabhaktuni clearly do not support the
> degree of pulmonary problems alleged by the claimant. He has continued to smoke
> despite being advised to stop. . . . He takes no prescribed medication. The claimant
> has "failed to establish that his impairments present since April 19, 2000, are of a
> level of severity to necessitate the need to lie down frequently during the work day.
> He has some residual leg pain from the leg fracture, but Dr. Snead felt that his
> problem was aggravated by heavy activity. Dr. Snead opined that the claimant

could perform sedentary work despite the combined left leg and back problems. The subsequent evaluations related to the claimant's back problem fail to establish a basis for a further reduction, as they fail to disclose any significant neurological deficit (R. 30).

The ALJ properly considered and evaluated the all objective medical evidence of record and the opinions of those physicians who treated, consulted with, or evaluated Plaintiff.

In addition properly considering and evaluating the objective medical evidence and the opinions of those physicians who treated, consulted with, or evaluated Plaintiff, the ALJ took into account the inconsistencies of Plaintiff's own statements. SSR-96-7p provides as follows:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:
>
> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.
>
> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.
>
> The consistency of the individual's statements with other information in the case

record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

The ALJ made the following finding: "With regard to the period since April 20, 2000, the claimant's testimony is not credible regarding the nature and extent of his alleged pain and functional limitations. . . . he gave conflicting statements regarding the aggravating factors in relation to his back and pulmonary problems" (R. 30). Plaintiff asserts the ALJ made a "kind of blanket, conclusory statement specifically prohibited by SSR 96-7p" and that his decision as to Plaintiff's credibility "is briefly discussed at different times and places in the Decision" (Plaintiff's brief at pp. 13 and 16). The undesigned finds the above quoted finding by the ALJ is not conclusory in that the ALJ's decision was supported by substantial evidence of record. The ALJ, in the body of his decision, distinguished the "conflicting statements" of Plaintiff as follows:

1)  On April 20, 2000, Plaintiff reported to Dr. Gobunsuy that he got "short of breath after walking one mile on level ground or chopping firewood for about one hour (R. 28);

    ● On August 21, 2001, Plaintiff reported to Dr. Guberman that "he became short of breath after walking 50 feet on level ground or walking up one flight of stairs," symptoms that were, according to the ALJ, "[i]n contrast to the aggravating pulmonary factors reported to Dr. Gobunsuy," (R. 28); and

    ● On October 24, 2001, Plaintiff, according to the ALJ, "once again elevated the degree of aggravating pulmonary factors" when he reported to Dr. Devabhaktuni that he experienced dyspnea "on even minimal exertion, such as taking a shower" (R. 29).

2)        On August 21, 2000, Plaintiff reported to Dr. Guberman that he had smoked one-half (½) package of cigarettes per day for five (5) or six (6) years, but before that, he had smoked one (1) package of cigarettes per day for twenty (20) years (R. 29, 261); and

• On October 24, 2001, Plaintiff reported to Dr. Devabhaktuni he had smoked one (1) package of cigarettes of cigarettes for twenty-five (25) to thirty (30) years, an example, according to the ALJ, of Plaintiff's elevating "the degree of aggravating pulmonary factors" (R. 29).

3)        On April 19, 2000, Plaintiff reported to Dr. Gobunsuy that he had constant back pain but no radiation of that pain; that the pain was made worse by bending, stooping, lifting heavy objects, and prolonged sitting, standing or ambulation; that lying flat on his back increased the pain; and that the pain improved when he switched positions (R. 29); and

• On August 24, 2001, Plaintiff reported to Dr. Hoover that his lumbar pain radiated to both legs, his back was "catching . . . all the time," and his legs gave out, complaints that were in "contrast to those made to Dr. Gobunsuy," according to the ALJ (R. 29).

The above listed inconsistencies found in Plaintiff's statements support the ALJ's finding that "[h]e has reported inconsistent statements regarding the nature and severity of his impairments" (R. 25).

In addition to the inconsistencies of Plaintiff's statements, the ALJ considered Plaintiff's activities of daily living in assessing his credibility. Plaintiff, he noted, lived alone, cooked, did dishes, watched television, read the newspapers, and spent time "fooling around with his buddy" (R. 30). These activities support the ALJ's finding that Plaintiffs "reported activities are inconsistent

with the degree of pain and functional limitations alleged" (R. 25).

The undersigned finds, therefore, the ALJ's credibility analysis was properly performed. He effectively and correctly evaluated the objective medical evidence, the opinions of those physicians who treated, consulted with, or evaluated Plaintiff, and the statements made by Plaintiff as to his symptoms and limitations. The ALJ, therefore, did not err in his application of the two-step credibility analysis mandated in SSR 96-7p; the ALJ did not err in enunciating the reasons for his finding as to Plaintiff's credibility; the ALJ did not make a conclusory statement about Plaintiff's credibility; and the ALJ's finding as to Plaintiff's credibility is supported by the substantial evidence of the record.

### E. VE Testimony

Plaintiff contends the ALJ erred by relying upon VE testimony, which was not consistent with the Dictionary of Occupational Titles (DOT), without attempting to resolve the conflict, as required by SSR 00-4p.

SSR 00-4p mandates, in part, the following:

PURPOSE: This Ruling clarifies our standards for the use of vocational experts (VEs) who provide evidence at hearings before administrative law judges (ALJs), vocational specialists (VSs) who provide evidence to disability determination services (DDS) adjudicators, and other reliable sources of occupational information in the evaluation of disability claims. In particular, this ruling emphasizes that before relying on VE or VS evidence to support a disability determination or decision, our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT), . . . and Explain in the determination or decision how any conflict that has been identified was resolved.

Questions have arisen about how we ensure that conflicts between occupational evidence provided by a VE or a VS and information in the DOT . . . are resolved. Therefore, we are issuing this ruling to clarify our standards for identifying and resolving such conflicts.

Occupational evidence provided by a VE or VS generally should be consistent with

30

the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will:

Ask the VE or VS if the evidence he or she has provided conflicts with information in the DOT; and

If the VE's or VS's evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.

At the administrative hearing, the ALJ asked the VE the following questions:

Please assume a younger individual with a limited education, with the ability to read and write. Precluded from performing all but sedentary work, with a sit/stand option. No repetitive bending. No hazards, such as dangerous and moving machinery, work at unprotected heights. No, I'm sorry, controlled environment, and by that, I mean, defined as free of excessive amounts of dust and fumes. With these limitations, sir, can you enumerate any jobs this hypothetical individual can perform? (R. 344).

The VE replied:

Yes, Your Honor, and I will use the – as the local regional economy, defined as 20 percent of the entire state of West Virginia, in terms of numbers of jobs. There would be the work of a hand packer. In the local regional economy, there would be five jobs. In the national economy, 7,5000 jobs. There would be the work of an assembler. In the local economy, there would be 62 jobs, and in the national economy – excuse me, 103,800 jobs. There would be the work of a security guard, which would be – a surveillance equipment alarm monitor, there would be eight jobs in the national – in the local and regional economy, and in the national economy, 5, 460 jobs (R. 345)

The ALJ then asked the VE the following question, "Are these jobs consistent with the DOT?," to which the VE responded, "Yes, Your Honor" (R. 345).

As this questioning by the ALJ and testimony of the VE demonstrate, the ALJ attempted to

31

identify any conflict between the VE's testimony and the information contained in the DOT in conformance with the mandate of SSR 00-4p. Plaintiff, however, asserts a conflict did exist in that two (2) of the three (3) jobs listed by the VE were not consistent with the requirements of the ALJ's RFC, and one job was not listed in the DOT (Plaintiff's brief at pp. 17 and 18). Plaintiff asserts that the term "hand packer" is not listed in the DOT. He claims the term "packer" appears 106 times, with various modifiers attached thereto. According to Plaintiff's argument, of the three jobs listed in the DOT that were most similar to "hand packer" – hand packager (920.587-018), packer (920.687-130), and packer (920.684.010) – each is listed as "medium" level jobs. Similarly, according to Plaintiff, the term "assembler" appeared numerous times (604) in the DOT and was modified to note various types of assemblers. One job was titled "assembler" (369.687-010), but it was listed as a "light" level job. Finally, Plaintiff alleges the job "surveillance equipment alarm monitor," which was the specific type of "security guard" noted by the VE in his testimony, did not exist in the DOT. There was a listing, however, for surveillance-system monitor (379.367.010), which was listed as "sedentary" work.

SSR 00-4p states, in part, that "The DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces. The term 'occupation,' as used in the DOT, refers to the collective description of those jobs. Each occupation represents numerous jobs."

The undersigned has considered the assertions of Plaintiff in light of the language found in SSR 00-4p. The ALJ correctly applied SSR 00-4p in that he, even though there were no "apparent" conflicts between the VE and the DOT during the VE's testimony, inquired of the VE as to any such conflict. Additionally, the ALJ was correct in his accepting the VE's answer to the hypothetical question as to what jobs existed in the local and national economies which could be performed by

32

Plaintiff based on his RFC. Since the occupations listed in the DOT and to which the VE referred are "collective" descriptions of occupations and "[e]ach occupation represents numerous jobs," the VE was correct in his testimony and the ALJ was correct in accepting the VE's testimony. Authority is conveyed to the ALJ to rely on the testimony of a VE in 20 C.F.R. § 404.1566(e), which reads as follows: "If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialists." Further,, the Fourth Circuit held, in *Prunty v. Barnhart*, 2005 WL 1926611 (W.D.Va.)), an unpublished opinion, that

> . . . substantial evidence supports the ALJ's conclusion that plaintiff could work in the night watchman position. During oral argument, the question was raised whether the VE's testimony conflicted with the definition of a night watchman in the Dictionary of Occupational Titles ("DOT"). To insure that such conflicts do not go unresolved, the Agency created Social Security Ruling ("SSR") 00-4p, which states that
>
>> [w]hen there is an apparent, unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.
>
> . . . It is clear under the regulations that the ALJ is permitted to rely on the testimony of the VE in reaching his decision.

ALJ's reliance on VE's testimony was not reversible error because VE offered jobs which were a composite of jobs which Plaintiff could perform and the ALJ inquired as to any conflicts between the VE and the DOT. It is not lost on this Magistrate Judge that the alleged discrepancy was not pointed out to the ALJ by Plaintiff's counsel during the administrative hearing. It was raised in briefings during the appeal processes.

The Fourth Circuit, in an unpublished decision, rejected the argument that AR 00-3 (same

as SSR 00-4p) requires an ALJ to uncover discrepancies between a vocational expert's testimony and the *Dictionary of Occupational Titles*. The ALJ's duty under AR 00-3 is to address evident discrepancies. Counsel's failure to raise the discrepancy during the hearing is some evidence that it was not obvious to him any more than it (the now asserted discrepancy) was then evident or obvious to the ALJ. *Justin v. Massanari*, 20 Fed.Appx. 158, 160 (4th Cir. 2001). The undersigned finds, therefore, that substantial evidence exists to support the ALJ's finding as to the opinion of the VE.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence supports the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **GRANTED,** Plaintiff's Motion for Summary Judgment be **DENIED,** and this action be dismissed from the court's docket.

Any party may, within ten (10) days after being served with a copy of this Amended Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), <u>cert.</u> <u>denied</u>, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this ___ day of September, 2005.

/s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE